IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MICHAEL L. ADAMS and DON W. STRONG,

|  |  |
|---|---|
| Plaintiffs, | CV-05-1798-ST |
| v. | FINDINGS AND RECOMMENDATIONS |
| HOME DEPOT USA, INC., doing business as THE HOME DEPOT, | |
| Defendant. | |

STEWART, Magistrate Judge:

## **INTRODUCTION**

Plaintiffs, Michael L. Adams ("Adams") and Don W. Strong ("Strong"), who are

African-American, complain that while employed by defendant, Home Depot USA, Inc., doing

business as The Home Depot ("Home Depot"), they were subjected to repeated comments and

treatment of a racially offensive character by their supervisors and repeatedly complained about

this treatment.  Strong, who is over 40 years of age, also claims that he was subjected to and

complained about ageist comments by those same supervisors.  Adams was terminated the day

1 - FINDINGS AND RECOMMENDATIONS

after he incurred an on-the-job injury for allegedly having too many absences.  Strong was

suspended for alleged insubordination after he complained of racism and ageism in the

workplace.  Strong claims that he was presented with the choice of returning to work under the

supervisors with discriminatory or retaliatory animus or accepting an involuntary shift transfer

without any guarantees that the actions against him would not continue, and was indefinitely

suspended without pay.  As a result, plaintiffs allege the following claims against Home Depot:

> First Claim (both): race discrimination in violation of Title VII of the Civil Rights Act of
>
> 1991, 42 USC § 2000e *et seq*, and ORS 659A.030(1)(a) & (b);
>
> Second Claim (Strong): age discrimination in violation of the Age Discrimination in
>
> Employment Act ("ADEA"), 29 USC § 621 *et seq.*, and ORS 659A.030(1)(a) & (b);
>
> Third Claim (both): retaliation for opposition to unlawful employment practices in
>
> violation of the Anti-Retaliation Statute pursuant to Title VII/ADEA and ORS
>
> 659A.030(1)(f);
>
> Fourth Claim (both): impairment of employment contract rights on the basis of race, in
>
> violation of 42 USC § 1981 ("Section 1981");
>
> Fifth Claim (both): common law wrongful discharge;
>
> Sixth Claim (Adams): workers' compensation discrimination in violation of ORS
>
> 659A.040.

This court has subject matter jurisdiction pursuant to Title VII, the ADEA, and 42 USC

§ 1981, and supplemental jurisdiction over the state law claims under 28 USC § 1367.

Home Depot has filed Motions for Summary Judgment (docket # 49) against all of Adams' claims and against all of Strong's claims (docket # 54).  For the following reasons, both motions should be granted in part and denied in part.

## LEGAL STANDARD

FRCP 56(c) authorizes summary judgment if "no genuine issue" exists regarding any material fact and "the moving party is entitled to judgment as a matter of law."  The moving party must show an absence of an issue of material fact.  *Celotex Corp. v. Catrett*, 477 US 317, 323 (1986).  Once the moving party does so, the nonmoving party must "go beyond the pleadings" and designate specific facts showing a "genuine issue for trial."  *Id* at 324, citing FRCP 56(e).  The court must "not weigh the evidence or determine the truth of the matter, but only [determine] whether there is a genuine issue for trial."  *Balint v. Carson City, Nev.*, 180 F3d 1047, 1054 (9th Cir 1999) (citation omitted).  A "'*scintilla* of evidence,' or evidence that is 'merely colorable' or 'not significantly probative,'" does not present a genuine issue of material fact.  *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F2d 1539, 1542 (9th Cir), *cert denied*, 493 US 809 (1989) (emphasis in original) (citation omitted).

The substantive law governing a claim or defense determines whether a fact is material.  *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F2d 626, 630 (9th Cir 1987).  The court must view the inferences drawn from the facts "in the light most favorable to the nonmoving party."  *Id* (citation omitted).

///

///

///

## UNDISPUTED FACTS

Because all material facts must be viewed in the light most favorable to the non-movant, this court will view the evidence most favorably to plaintiffs.  A review of the parties' facts, as well as the other materials submitted by the parties, including affidavits, declarations, and deposition excerpts,[1] reveal the following facts.

### I.    Adams' Employment with Home Depot

#### A.    Hiring

Adams is an African-American male who started work on May 31, 2003, on the night-shift as an associate in the freight department at Home Depot's Jantzen Beach store.  Adams Depo, pp. 16, 20, 23-24, 27; Steenson Decl, Exhibits 3 & 17.  Cheryl Nickerson ("Nickerson"), the Jantzen Beach Store Human Resources Manager, interviewed and hired Adams.  Adams Depo, pp. 16-17; Nickerson Depo, pp. 5, 13, 92.  Nickerson also is African-American.  Nickerson Depo, p. 6.

Adams was initially hired as a part-time associate.  *Id* at 93, 128.  Based on a request made by Assistant Manager Mark Dice ("Dice"), Nickerson moved Adams to a full-time position a month later.  Adams Depo, p. 28; Nickerson Depo, pp. 128-29.

Adams attended orientation during his first two days of work; the orientation covered the "basic information" about Adams' job as well as Home Depot's Harassment and Discrimination Policy.  Adams Depo, pp. 19-20; Nickerson Depo, p. 97; Ostroff, Decl, Exhibit 4.  Adams, like all new associates, also received an orientation kit.  Nickerson Depo, p. 97.

---

[1] The parties have submitted documents with various attachments.  Citations to affidavits and depositions are identified by the last name of the affiant or deponent, and citations are to the paragraph(s) of the affidavit or page(s) of the deposition transcript.

Adams' orientation kit included "Guidelines for Attendance and Punctuality." Nickerson Depo, pp. 103-05. Management is expected to "apply common sense and exercise reasonable discretion to consider all relevant circumstances when applying" these attendance guidelines. *Id* at 109; Ostroff Decl, Exhibit 19, p. 1. The attendance guidelines set out a point system for associates with unexcused absences or other attendance problems. Nickerson Depo, pp. 105, 119; Ostroff Decl, Exhibits 18 & 19. An associate who accumulates 10 or more points within a 12-month period may be terminated. A "No Call/No Show" equals five points while an "unexcused absence" is three points on a weekend/holiday and two points on a weekday. A No Call/No Show is defined as "[a]ssociates failing to call in and not reporting to work when scheduled at least one hour after their designated start time." Ostroff Decl, Exhibit 18, p. 4 & Exhibit 19, p. 5. Management has "discretion" as to how to handle a No Call/No Show. Dice Depo, pp. 18-19. The policy also provides for a maximum of 48 hours (*i.e.*, six full-time days) of sick/personal leave during a "rolling 12-month period." Ostroff Decl, Exhibit 18, p. 4 & Exhibit 19, p. 5.

Home Depot's Code of Conduct sets the appropriate level of discipline for attendance violations. Nickerson Decl, ¶ 5 & Exhibit 2. The Code requires progressive discipline and permits termination after repeated violations of the attendance policy. *Id.*

Adams received "acceptable" performance reviews in July 2003, June 2004, and December 2004. Steenson Decl, Exhibits 4, 8, & 12.

///

///

///

5 - FINDINGS AND RECOMMENDATIONS

B.      **Comments by Dice and Youman**

1.      **Mark Dice**

When Adams started, Mark Yamashita ("Yamashita) was the Department Head and Dice was the Assistant Store Manager. Adams Depo, p. 29. Dice is Caucasian. Strong Decl, ¶ 10.

Adams recalls two comments by Dice that he considered racially insensitive. Once, while the two were talking, Dice volunteered that his wife's brother and mother were members of the Aryan Nation and would walk around with shotguns. Adams Depo, p. 44; Adams Decl, ¶ 9e. Adams did not respond to the comment. On another occasion, in or about mid 2004, Dice said to him "Com on, Darkman, hurry up." Adams Decl, ¶ 9f; Adams Depo, pp. 44-45. Adams did not report that comment to anyone. Adams Depo, pp. 45-46, 99. At different times, Adams heard Dice call employee Morgan Dachelbai ("Dachelbai"), an Asian/Pacific Islander, a "dark man." Adams Decl, ¶ 9g. Dice admits that he and some other freight associates called Dachelbai, who has dark skin, "Dark Man." Dice Depo, pp. 34-35. According to Dice, Yamashita coined that nickname for Dachelbai based on the movie "Dark Man" about a superhero-type character and was intended to reflect his positive work ethic. *Id* at 149-41.

Dice also made other types of comments to Adams that he did not make to other non-African-American employees. In or about mid-2005, Dice said to Adams: "Oh, you want some loving? I got some loving for you." Adams Decl, ¶ 9i. One of Adams' coworkers on the freight team was Evan Youman ("Youman") who eventually became Department Head. Adams Depo, p. 30. Youman is Caucasian. Strong Decl, ¶ 10. When Adams complained, Youman laughed it

off and said his wife would "kick my ass" if she knew he talked like that.[2]  *Id.*  Another time Dice whistled at Adams in a sexual way.  *Id* at ¶ 9j.  Adams told him: "I'm not with that.  You should leave that at home for your wife."  *Id.*  Dice gave Adams a little look and walked away. *Id.*  Once Adams was eating something and Dice told him to get rid of it because he had something else for him to suck on.  *Id* at ¶ 9k.  That was one of many times Dice made a remark to him about sucking on his genitals, *e.g.*, "Woo-hoo.  Suck my dick, bitch."  *Id.*

### 2.    Evan Youman

While a coworker, Youman allegedly made several comments that Adams considered "inappropriate."  Adams Depo, p. 30.  In the first incident, Youman observed Adams operating a piece of machinery in violation of two safety rules.  *Id* at 30-31; Youman Depo, p. 88. According to Adams, Youman said: "What the fuck do you think you're doing?  This is not how we operate here."  Adams Depo, pp. 31-32.  When Adams told Youman what he was doing, Youman replied:  "I don't give a fuck what you're doing.  We have work around here to be done."  Adams Decl, ¶ 9a.  He then told Adams to get his "ass" back to his department and his job.  *Id.*  Adams believed that Youman spoke to him as if he were "a child" and was trying to get into a fight with him.  *Id*; Adams Depo, pp. 30-31.  Adams told Youman to "back up or I will fuck [you] up."  *Id* at 32.  Youman left and told Yamashita about the exchange.  *Id.*  Yamashita met with the pair and tried to "smooth things out."  *Id.*  However, they never apologized to each other, and Adams never reconciled with Youman about the incident.  *Id* at 33-35.

The second incident started when Youman allegedly said that he had never been beaten up.  *Id* at 35.  When Adams asked what that was supposed to mean, Youman said: "You think

---

[2] Youman admits that he and Dice talked about sex, sexual intercourse and oral sex.  Youman Depo, pp 73-74.

you're tough.  I used to be a wrestler, so I'm not scared of anybody." *Id*.  Adams responded:

"I'm not scared of anybody either, I've never got beat up before either." *Id*.  The incident went

no further and was not reported.  *Id* at 35-36.

Youman also would make negative comments to Adams about how he was doing his job

or how fast he was working which interfered with Adams' work by distracting and upsetting

him.  Adams Decl, ¶ 9c.  For example, when Youman noticed Adams had not finished his work,

he said:  "You need to hurry up.  My grandma can move faster than you."  Adams Depo, pp. 37-

38.

After Youman was promoted to department head, some members of the freight team were

concerned because of Youman's hard-charging attitude.  *Id* at 41-42.  Youman was a hard

worker, but Adams thought he "had a chip on his shoulder" and would "pick and choose" the

people he made demeaning comments towards.  *Id* at 36-37.  Youman talked to Adams, Strong,

Cliff Baker and a couple of others like they were kids.  Adams Decl, ¶ 9h.  Not long after Strong

started working, Adams heard Youman say to Strong: "Get your ass moving or I'm going to

crack the whip."  *Id* at ¶ 9d.  The comment was made at the beginning of the shift as Youman

walked behind Adams.  *Id*.  Adams believed the comment was a reference to slavery and found it

very racist and highly offensive.  *Id*.  Strong heard the same comment from Youman and recalls

him saying: "I want you to really pick it up tonight or I'm going to be cracking the whip on your

ass if you don't get your ass moving."  Strong Decl, ¶ 11a.  Strong believed the comment was a

reference to slavery and very racist, and deemed it incredibly offensive to him and Adams.  *Id*.

A coworker, Bob Astleford, also heard the comment and complained to Dice about it.  Astleford

Decl, ¶ 2.

8 - FINDINGS AND RECOMMENDATIONS

Adams complained about Youman's behavior to Dice. Once, Adams told Dice he did not like the way Youman talked to him "like [he was] a kid." Adams Depo, pp. 89-90. A month later, Adams told Dice he did not like the way Youman "ordered" him to do something rather than simply "asking me to do it." *Id* at 91-92. Dice's response was: "It's better than flipping burgers." Adams Decl, ¶ 10. Dice later met with Youman and told him to change the way he addressed associates by asking them to do things "more in an asking manner rather than a directive manner." Youman Depo, p. 35. However, Adams perceived that Youman's behavior never improved. Adams Decl, ¶ 11.

Adams never reported that he believed Youman was singling him out or harassing him because of his race. Adams Depo, p. 112.

C.    **Attendance Issues**

Adams knew that under Home Depot's policies he was required to call in to the store if he was not going to be able to work during his scheduled shift. *Id* at 49, 54.

On February 3, 2004, Adams missed his shift to take his daughter to the hospital for a life-threatening medical emergency and failed to notify anyone that he would be absent. *Id* at 47. Adams worked his next shift and explained to Dice what had happened, to which Dice expressed no concern. Adams Decl, ¶ 12. However, Dice issued Adams a disciplinary notice which Adams signed. Ostroff Decl, Exhibit 6. The notice stated: "On Tuesday 2-3-04, Mike failed to work his scheduled shift and he did not call and inform a member of management of his intended absence." *Id.* The notice also stated in the "Improvement Required" section that Adams "must adhere to the attendance policy, work his scheduled shift, and if he is unable to

work, he must call a member of management before his scheduled shift." *Id*. Adams also had a counseling session with Dice regarding his attendance. Ostroff Decl, Exhibit 7.

On March 9, 2004, Adams called to say he would be two hours late for his shift. *Id* at Exhibit 8. Dice agreed to Adams coming in late. Adams, however, never showed up and failed to call in later. *Id*. According to Adams, he was picking up his grandmother from the airport that night, did not have a cell phone, and could not leave his vehicle unattended at the airport to use a pay phone to report a delay. Adams Depo, p. 54. By the time he got home to call, there was only about an hour or so left in his shift, so he felt it would not do any good to call then. Adams Decl, ¶ 13. Adams received another disciplinary notice from Dice detailing this violation. Adams Depo, p. 55; Ostroff Decl, Exhibit 8. The "Improvement Required" section stated that Adams "<u>must</u> work his scheduled shift . . . If Mike cannot make it to work he <u>must</u> call and inform a member of management, Mike has had an attendance problem and it must stop at this discussion." Ostroff Decl, Exhibit 8 (emphasis in original). Dice counseled Adams about the incident. *Id*, Exhibits 7 & 8.

On October 18, 2004, Adams called in at 10:15 pm to report that he had a flat tire and would be two-hours late. Adams Depo, p. 52; Ostroff Decl, Exhibit 9. He never showed up and never called back to say he would not be in at all. Adams Depo, p. 52. According to Adams, he walked to a gas station to fill the tire with air, but learned it had a hole and had no money to get it fixed. Adams Decl, ¶ 14. He walked back home, arriving at about 2:00 am, and being very frustrated, forgot to call back to work. *Id*. He later told Dice what had happened and Dice said everything was okay. *Id*. However, Adams received another disciplinary notice from Dice detailing this incident. Ostroff Decl, Exhibit 9. The "Improvement Required" section stated:

10 - FINDINGS AND RECOMMENDATIONS

"Your attendance will be monitored on a daily basis.  Any additional unexcused absence may result in further disciplinary action up to and including termination, per Home Depot Rules of Conduct SOP 01-24.  Your next counseling session will be a Final Counseling."  *Id*.

On October 25, 2004, Adams received a related disciplinary notice because he had also taken more days of leave then he was entitled to.  Adams Depo, pp. 62-63; Ostroff Decl, Exhibit 10.  The notice stated: "Per Home Depot's attendance guidelines, each associate is granted 6 personal/sick days per year.  You have exceeded this amount."  Ostroff Decl, Exhibit 10.  The "Improvement Required" section stated: "Your attendance will be monitored on a daily basis. Any additional unexcused absences or other attendance issues will result in termination if occurring within 30 days of this counseling session.  If any should occur after that 30 day period, you will receive another final counseling."  *Id*.

On December 21, 2004, Adams received his yearly Performance Summary.  Ostroff Decl, Exhibit 11.  The summary had a section for "Development Plans and Training," which provided that Adams needed to "Work scheduled shift without fail, [and] reduce sick calls."  *Id*.  After he received this, Adams understood that he needed to focus on his attendance issues.  Adams Depo, p. 65.

Adams called in sick twice in January 2005, once on January 12 and again on January 17. Ostroff Decl, Exhibit 7.  Dice recorded these absences on Adams' "Performance Discussion Tracking Form."  Ostroff Decl, Exhibit 7.  He noted: "I am speaking to Mike about his attendance.  It has been an ongoing issue; he has been coached/counseled many times and at this point, he is being given a 'final notice.'  Mike must make every attempt to correct this issue, any

unexcused absences will result in discipline actions up to and including termination.  Mike was 'sick' on 1-12-05 and 1-17-05 - both unexcused absences."  *Id*.

At the same time, Dice also issued Adams a "final counseling" disciplinary notice, which Adams signed and dated.  Adams Depo, p. 68; Ostroff Decl, Exhibit 12.  The notice provided, in part: "Per Home Depot's attendance guidelines, each associate is granted 6 personal/sick days per year.  You have exceeded that amount."  Ostroff Decl, Exhibit 12.  The "Improvement Required" section stated: "Your attendance will be monitored on a daily basis.  Any additional unexcused absence or other attendance issues will result in termination."  *Id* (emphasis in original).

Adams missed work again on February 21, 2005.  Ostroff Decl, Exhibit 13.  At 9:50 pm, he called to report that he needed to take his pregnant girlfriend to the emergency room.  *Id*; Adams Depo, p. 85.  He planned to call Home Depot again about his status "as soon as [he] knew exactly what was going on" with her.  Adams Depo, pp. 85-86.  Instead, while his girlfriend was being treated, Adams fell asleep on a sofa in the waiting room.  *Id* at 86.  His girlfriend woke him up at 2:00 am and drove him home.  Adams fell asleep in the car and "spaced" calling Home Depot about his status.  *Id* at 86-87.  No one at Home Depot told Adams that they doubted his girlfriend's emergency or asked him to provide any medical documentation.  Adams Decl, ¶ 18.  Dice documented the incident on Adams' "Performance Discussion Tracking Form" as follows: "I have already given Mike a 'final' notice for his attendance issue and Mike is aware of the disciplinary actions that he may face due to his unexcused absence."  Ostroff Decl, Exhibit 13.

///

12 - FINDINGS AND RECOMMENDATIONS

///

///

### D.    <u>Discharge</u>

Dice had no authority to discharge Adams.  Dice Depo, pp. 124-25.  His role in the

discharge process was to approach Nickerson shortly after the February 21, 2005 incident, tell

her that Adams had another No Call/No Show despite being told to come to work and about his

ongoing attendance issues, and recommend termination.  Nickerson Depo, p. 112.[3]  He also

provided Nickerson with the relevant documentation on Adams.  Dice Depo, p. 125.

Nickerson discussed Adams' situation with Home Depot's Regional Human Resources

Manager, Alisa Grandy, and the Jantzen Beach Store Manager, Peter Ledesma.  Nickerson Depo,

pp. 109-10. Nickerson also reviewed Adams' disciplinary notices, confirmed he received

progressive discipline, and ensured that none of the absences being counted against him were

protected by the Family Medical Leave Act.  *Id* at 110-11.  Nickerson then made the decision to

discharge Adams and informed Dice of her decision.  Dice Depo, pp. 25, 125-26.  This was

about a week or a week and a half after Dice brought her Adams' file.  Nickerson Depo, pp. 112-

13.  The termination notice stated that Adams had exceeded the six-day personal or sick days

guideline.  Ostroff Decl, Exhibit 14.

### E.    <u>Subsequent Events of March 9, 2005</u>

On March 9, 2005, Adams and Strong were working together in the paint department and

had fallen behind.  Adams Depo, pp. 71-73, 75.  Youman noticed and checked on them several

---

[3]  While Dice testified that he did not recommend termination, but simply took the information to Human Resources, his testimony contradicts Nickerson's deposition which is more favorable to the non-moving party and will be treated as true for purposes of the summary judgment motion.  *Compare* Dice Depo, pp. 124-25, with Nickerson Depo, p. 112.

13 - FINDINGS AND RECOMMENDATIONS

times. *Id* at 72. Sometime later, Youman walked into the department and asked, "Hey, you monkeys done yet?" *Id* at 75-76; Adams Decl, ¶ 9l. Both Adams and Strong considered the comment to be racially offensive. *Id*. Adams did not respond. Adams Depo, p. 76.

About 30 minutes later, Adams began to experience cramps and told Youman. *Id* at 76-77. Youman asked Adams whether he was able to continue working and Adams said yes. *Id* at 77. Youman, however, brought three or four other members of the freight team over to the paint department to help. *Id*. One of the team members, Rachel Saenz ("Saenz"), tried to help the cramps by massaging Adams' arms. *Id*. Adams cannot recall whether Saenz also offered him advice on how to alleviate the cramps. *Id* at 78. Saenz, however remembers telling Adams he should go home and eat some bananas to counteract one possible cause of the cramps, low potassium. Saenz Decl, ¶ 4.

Later, as Adams and Saenz walked to the time clock, Youman also told Adams that, "to make [myself] feel better, I should go home and eat some bananas." Adams Depo, pp. 78-79. Adams thought this was another way to refer to him as a "monkey." Adams Decl, ¶ 9m. Strong overheard Youman's comment and also thought it was offensive in light of Youman's previous reference to him and Adams as being monkeys. Strong Decl, ¶ 11n.

Adams' cramps continued after he went home. Adams Depo, pp. 80-81. He was scheduled to work the next night but did not. *Id* at 81. Adams called in and told a "new manager" that he was not coming in due to an on-the-job injury. *Id*; Adams Decl, ¶ 20. The new manager told Adams that he would let Dice know. Adams Depo, p. 81. Adams did not seek medical treatment for his cramps; instead he drank lots of fluids and soaked in the tub until the cramps went away the following day. *Id* at 80-82.

14 - FINDINGS AND RECOMMENDATIONS

*///*

### F.    Notice of Termination

On March 11, 2005, Adams met with Dice and Youman and was informed by Dice that

he was being terminated because of poor attendance.  *Id* at 82-83; Ostroff Decl, Exhibit 14.

Adams did not mention his cramps.  Adams Depo, pp. 83, 88.  Neither Dice nor Nickerson

learned about Adams' cramping episode until much later.  Nickerson Depo, pp. 114, 125; Dice

Depo, p. 79.  At the meeting, Adams received his termination notice, which provided:

> Per Home Depot's Attendance Guidelines, each associate is granted six
> personal/sick days per year. You have exceeded this amount. When you
> are absent, it not only affects workflow but also other associates overall
> morale due to increased workload.  Mike has been on "final" notice of his
> attendance issue on 1-18-05, Mike is aware of the impact his absence
> makes on the productivity of the crew and is aware of potential
> disciplinary action.

Ostroff Decl, Exhibit 14.

At the time of his discharge, Adams was making $9.62 an hour.  *Id* at Exhibit 17; Adams

Depo, p. 59.

### G.    Subsequent Employment

After leaving Home Depot, Adams obtained substitute employment working in the stock

room of Lamps Plus in Clackamas, Oregon.  Adams Depo, pp. 93-94.  He was initially placed

there through a temp agency and worked full time.  *Id* at 94-95.  In September 2005, Adams

accepted a full-time, permanent position at Lamps Plus at the rate of $9.50 an hour.  *Id* at 93, 95.

In January, 2006, Adams voluntarily quit that job in order to join his girlfriend and daughter in

Goldendale, Washington.  *Id* at 6-7, 94, 96.  Because he has been unable to find a job, he stays at

home and cares for his two daughters.  *Id* at 93, 96; Adams Decl, ¶ 23.

///

**II.    Strong's Employment With Home Depot**

    **A.    Hiring**

Strong is a 53-year-old African-American male hired who started work April 12, 2004,[4]

on the night shift part-time as an associate in the freight department at Home Depot's Jantzen

Beach store.  Ostroff Decl, Exhibit 3, p. 3; Strong Decl, ¶ 3.  Strong was told he would later be

considered for full-time work after a performance evaluation.  Strong Depo, pp. 24-26;

Nickerson Depo, pp. 196-98.

    Nickerson interviewed and hired Strong.  Strong Depo, pp. 22-23, 27; Nickerson Depo,

p. 193.  Like Adams, Strong attended two days of orientation and received an orientation kit with

Home Depot's Harassment and Discrimination policy.  Strong Depo, pp. 28-29; Nickerson

Depo, pp. 75-76, 99-100; Nickerson Decl, ¶ 4.

    **B.    Performance Expectations for the Freight Team**

    During orientation, Strong took a two-hour course called "Receiving and Freight -

Working As a Team."  Strong Depo, pp. 44-45; Ostroff Decl, Exhibit 5.  Strong received a

"Participation Guide" in connection with this class which details Home Depot's pallets-per-hour

standard in two different sections.  Strong Depo, pp. 44-48; Ostroff Decl, Exhibit. 6, pp. 1-3.

Strong "vaguely" recalls the computer recordings during the class addressing the experienced

pack-out team averaging more than four pallets per hour, but does not remember any discussions

---

[4]  Strong believes his start date was around April 19, 2004.  Strong Decl, ¶ 4.  However, in his application for a subsequent job, his start date with Home Depot was noted as April 12, 2004.  Ostroff Decl, Exhibit 13, p. 1.

with Dice or the orientation classes about the pallets-per-hour standard.  Strong Depo, pp. 48-49.

///

**C.**    **90-Day Performance Evaluation and Request for Full-Time Employment**

Strong received his initial, 90-day performance evaluation from Dice on July 3, 2004.
Strong Depo, pp. 34-35; Dice Depo, p. 8; Ostroff Decl, Exhibit 7.  Dice rated Strong as a
"performer," meaning that his performance was "acceptable."  Ostroff Decl, Exhibit 7.  The
review contained many favorable written comments such as "supporting the 'Team,'" "being a
hard worker," and "[g]enerally complete[ing] work within time frame allowed."  Steenson Decl,
Exhibit 9.

In the Associate Action Notice accompanying the performance evaluation, Dice wrote
"90 day review- GREAT JOB."  *Id* at Exhibit 10.  In another July 2004 document entitled "Good
Job Performance Recognition," Dice wrote "keep up the great work, thank you Don" and noted
that Strong "has done a great job taking on increased workloads, on many occasions we have
been short associates on the freight team and Don has increased his ability to get things done.
Don truly understands the importance of teamwork."  *Id* at Exhibit 11.

After receiving his July 3, 2004 evaluation, Strong approached Dice "maybe a week"
later and asked to be moved to a full-time position.  Strong Depo, pp. 26-27, 39.  Dice responded
by telling Strong he might not be capable of working as a full-time associate because he was not
meeting Home Depot's performance expectations.  *Id* at 38- 40.  Dice said there could be an age
factor involved in not meeting Home Depot's 3.5 pallets per hour expectation and that they
would need someone a little younger who would be able to keep up with the 3.5 pallets per hour

17 - FINDINGS AND RECOMMENDATIONS

standard.  *Id* at 39-40; Strong Decl, ¶ 8.  Dice did, however, tell Strong he would talk with

Nickerson about Strong's request.  Strong Depo, p. 41.

Dice inquired with Nickerson whether any full-time positions were available for Strong.

Dice Depo, pp. 28-31; Nickerson Depo, pp. 199-201.  Nickerson could not remember whether

Dice supported or was opposed to Strong becoming employed full-time.  Nickerson Depo,

pp. 200-01.  Nickerson told Dice that there were not enough hours available in the freight

department to justify moving Strong to a full-time position and Dice relayed that information to

Strong.  Dice Depo, pp. 31-32; Strong Depo, p. 41.  At this time, Strong was averaging about 32

hours per week and was sometimes required to work 40 hours per week despite his part-time

status.  Strong Decl, ¶ 4; Strong Depo, p. 235.  After learning that no full-time positions were

available, Strong told Dice that he wanted his hours reduced and wanted all Fridays off.  *Id* at

235-36.  Dice approved Strong's request to take all Fridays off.  *Id* at 236; Dice Depo, pp. 84-86.

**D.    Subsequent Dealings with Dice, Youman, and Nickerson**

Strong claims that Dice made two comments that led him to believe Dice was holding

him to a higher pallets-per-hour standard than his coworkers because of his age.  Strong Depo,

pp. 39-40, 60-61.  The first comment was a month into his employment and Strong took it as

"advice" not "an insult."  *Id* at 61.  Specifically, Dice told Strong that he should consider

working in another department where the type of work and work load would be more suitable to

someone his age.  Strong Decl, ¶ 11c.  The second comment, made after the 90-day performance

evaluation, reflected Dice's opinion that Strong was not fit for a full-time position because of his

age.  Strong Depo, pp. 39-40; Strong Decl, ¶ 8.  Strong did not report either comment.  Strong

Depo, pp. 59, 61-62.

18 - FINDINGS AND RECOMMENDATIONS

A couple of weeks after his start date, Strong was told by Youman (Night Operations Supervisor at the time) that he wanted him "to really pick it up tonight or I'm going to be cracking the whip on your ass if you don't get your ass moving." Strong Decl, ¶ 11a. The comment was made at the beginning of the shift as Youman waked behind Adams. *Id*. Strong believed the comment was a reference to slavery, very racist and offensive towards him and Adams. *Id*. Strong was also present when Dice referred to Adams as "Darkman." Strong Depo, p. 65.

Strong heard Dice exchange locker-room-type vulgar language and insults with other associates, including Adams, by calling them "bitch," "whore" and telling them to "suck his genitals," and said that these individuals sometimes responded with similar vulgarities. *Id* at 65-66. Dice never addressed these comments to Strong because he would not "get into that with him." Strong Depo, p. 65. However, Dice asked Strong to approach Dachelbai and refer to him as a "bitch," which Strong refused to do. Strong Decl, ¶ 11i.

Nickerson learned about the allegations of vulgar language from another associate and in June 2004 held a meeting with the freight team (but without Dice and Youman) to address the complaints of harassment and vulgar language against the two supervisors. Strong Depo, pp. 72-74; Strong Decl, ¶ 12b; Nickerson Depo, pp. 77-78.

Immediately after the meeting, Strong and Nickerson talked privately and discussed the incident where Youman had told him that he would "crack the whip." Strong Depo, pp. 65-66, 74-76; Strong Decl, ¶ 12b. Nickerson had already learned of the comment from another associate, not from Strong. Strong Depo, p. 77. During their discussion, Strong also complained about not being full-time and being harassed and "singled out" by Youman. *Id* at 80; Strong

Decl, ¶ 12b.[5]  For example, he told Nickerson that Youman repeatedly put unfair time limits on

him, constantly badgered him, and repeatedly made age comparisons between them.  Strong

Depo, pp. 79-81; Strong Decl, ¶ 12b.

Nickerson asked Dice to investigate the "whip" comment.  Nickerson Depo, pp. 49, 51;

Dice Depo, pp. 76-77.  Nickerson told Dice that regardless of what Youman said, Dice needed to

make it clear to Youman to be aware of his language.  Nickerson Depo, p. 52.  Dice spoke with

Youman as part of his investigation; Youman denied making the comment and attributed it to

Strong, saying Strong had asked him, "are you going to crack the whip."  Dice Depo, p. 77.  Dice

also spoke with Strong, who repeated that Youman had told him he was going to crack the whip,

and then reported back to Nickerson.  *Id* at 77-78.  Dice believed that either he or Nickerson

coached Youman about the situation, although Dice believed he had no reason to give him

coaching at that time.  Dice Depo, p. 78.  Youman was not disciplined for this incident.  *Id*.

On January 4, 2005, Youman started the shift holding Strong to the 3.5 pallets per hour

standard, but repeatedly limited Strong's time to five to 10 minutes and made Strong go from

department to department doing various job assignments.  Strong Depo, p. 139.  Youman became

irrate when he saw that Strong had not finished one of the tasks.  *Id* at 147.  Youman started

"jumping up and down" and accusing Strong of not doing his job, not performing the 3.5 pallets

and of "sloughing off on the job."  *Id*.  He then said:

> You're not - - you're wasting time over here.  You should have been done.
> I could have gotten it done in 10 minutes.  Here it's gone on over half an
> hour and you're still not done.  You've had a break and you came back off
> your break and you're still not done.  You should have been done.  you're

---

[5]  While Strong's declaration also claims he complained about Dice during this meeting, his deposition states that he
does not think he did.  *Compare* Strong Decl, ¶ 12b, with Strong Depo, pp. 90-91.

> not Home Depot's - - not the kind of person Home Depot is looking for. You're too old. You're too old to do the job, and you really should be looking - - seeking work elsewhere, because this is not Home Depot - - you're not Home Depot material.

*Id* at 148.

Strong told Youman he thought he was being singled out for performance expectations. *Id* at 150. He was called into a meeting with Dice later that night and reiterated that he was being singled out because of his age. *Id* at 149-52. It is unclear if he also referred to his race. *Id* at 152 ("I didn't use - I didn't use my race. I didn't throw my African-American out there at him, no. I just said I felt I was being singled out and harassed because of my age and my race."). In response, Dice became very upset with Strong, started showing some violent signs, stood up over Strong with his fists clenched, accused him of not doing his job, and threatened him by saying that if Strong could not live up to Home Depot's standards, he could go look for a job somewhere else. Strong Decl, ¶ 12d. That same day, Dice wrote up a disciplinary notice for poor job performance. Strong Depo, pp. 138-39; Ostroff Decl, Exhibit 8.

On March 9, 2005, Strong was loading freight in the paint department with Adams when Youman asked them both: "Are you monkeys done yet?" Strong Depo, p. 101; Strong Decl, ¶ 11m.

On March 17, 2005, after Adams' termination, Strong complained to Dice about Youman's "crack-the-whip" statement, his belief that he felt Youman was singling him out and that he may have some race issues with Strong and Adams, also told him about the "crack the whip" comment and the monkey statement, as well as about Youman's age-related comments and the time limits imposed on him. Strong Depo, pp. 115-16. Strong also expressed his belief that Adams had been "unjustly fired" the week before. *Id* at 116, 128-29; Strong Decl, ¶¶ 12e &

21 - FINDINGS AND RECOMMENDATIONS

12f.  Dice responded that he did not think that Adams' termination was because of his race.

Strong Decl, ¶ 12f.

     **E.**     <u>**March 22, 2005 Incident**</u>

     On March 22, 2005, Youman was monitoring Strong's work.  Strong Depo, p. 162.

Youman told Strong he should be able to finish a task in 10 minutes, but Strong said he may

need an hour.  *Id* at 163.  Youman called Strong into a meeting with Dice.  *Id*.  Dice told Strong

he was not satisfying performance expectations.  *Id* at 163-64.  Strong responded by telling Dice

that he thought he was being singled out, and that both Dice and Youman "had some race issues

concerning [himself] and Adams."  *Id* at 164.  This was the first time that Strong directly accused

Dice of having race issues.  *Id*.

     According to Strong, Dice then "jumped out of his seat," and "told me that if I want to

throw down with him right now, I can."  *Id* at 165; Strong Decl, ¶ 12g.  Strong told Dice to back

off and Dice swore at him and told him to "get out."  *Id*.  Strong asked if he was being fired and

Dice said: "No, I'm telling you to leave the building right now."  Strong Depo, p. 165.  Strong

again asked if he was being fired and Dice told him: "No. You're being suspended for

insubordination."  *Id* at 166; Strong Decl, ¶ 12g.  Strong requested that his suspension be

reflected in a written, signed, dated document and handed to him before he left the building, and

Dice responded that "he didn't have to write a F'ing thing, he can make me leave right now, he

would call the police if necessary."  Strong Depo, p. 166.  Strong refused to leave without a

written note and Dice finally wrote it as follows: "I am sending Don Strong home from work

until I can review the situation with Human Resource Dept.  The reason Don is being sent home

is his insubordination."  *Id* at 166-67; Ostroff Decl, Exhibit 9.  While the note did not expressly

state it was a suspension, Nickerson admitted that it meant "the same thing."  Nickerson Depo,

p. 215.  Throughout his suspension, Strong was not paid.  Strong Decl, ¶ 13d.

      The next morning, Dice told Nickerson about the meeting and that she needed to call

Strong.  Nickerson Depo, p. 215; Dice Depo, p. 95.  Nickerson and Strong exchanged voice

messages.  Strong Depo, p. 199.  When they finally spoke, Nickerson told Strong that his "job

was there waiting for him" but did not tell him that he had to report to work.  Nickerson Depo,

p. 228.  At an unidentified date, Nickerson tried to set up a meeting, but Strong told her he

wasn't ready "because there [were] documents that he was preparing."  Nickerson Depo, pp.

227-28.  On March 28, 2005, Strong's then-attorney, Jim Leuenberger, sent a letter to Human

Resources complaining about the hostile work environment Strong experienced at Home Depot,

giving some examples of discriminatory comments, seeking disciplinary action against

supervisors Dice and Youman, reinstatement with full pay for any time lost due to suspension, as

well as placement in a full-time position.  Steenson Decl, Exhibit 14.  The two eventually agreed

to meet on April 5, 2005.  Strong Depo, p. 199.

      Strong brought his attorney to the meeting.  *Id*; Nickerson Depo, p. 245.  Nickerson

refused to meet with Strong unless his attorney would not be present, stating that otherwise she

would have to involve Home Depot's corporate attorneys.  Strong Depo, p. 200.  Strong agreed

to meet with her alone.  *Id*.

      During the meeting, Strong provided Nickerson with a letter dated January 27, 2005, and

discussed his concerns, including the monkey and the banana comments, as well as Youman's

March 17, 2005 statement about Strong's age.  Strong Depo, pp. 201-03, 224-25; Ostroff Decl,

Exhibit 10.  According to Strong, Nickerson told him that she "wasn't aware that a lot of these

things were occurring . . . that it wasn't brought to her attention."  Strong Depo, pp. 208, 224-25.

The meeting eventually turned to Strong's "job situation."  *Id* at 227.  Nickerson then offered

Strong "another position, perhaps maybe day shift or did I want to stay on the night shift.  She

stated that there was something on the day shift that she could possibly get me into."  *Id*;

Nickerson Depo, p. 234.  Strong responded by asking her "what she was prepared to do about

this whole situation . . . what was she preparing to do to correct the whole issue."  Strong Depo,

p. 227.  Nickerson told Strong she was launching an investigation.  *Id* at 227-28.  Strong told her

that he could accept either a day or a night position, but he wanted to know how she was going

to reassure him that this would not happen again.  *Id* at 228.  Strong knew that if he accepted a

position on the day shift he would no longer be supervised by Dice or Youman, but he was

worried about the "possibility" of "hostility" or "that what happened to me on the graveyard shift

could follow me to the day shift."  *Id* at 228-29.  Nickerson did not tell him what she would do to

prevent what he perceived to be retaliation.  Strong Decl, ¶ 14.  Strong also wanted

"compensation" but did not elaborate as to the amount of compensation.  Strong Depo, pp. 230-

31; Nickerson Depo, p. 237.  Nickerson told Strong that his demand for compensation was out of

her hands and would have to be sent to their corporate office.  Strong Depo, p. 231.  Strong

asked Nickerson "when will I be hearing from her, when will she be letting me know when I can

return to work, and she said just to be expecting to hear from her sometime soon."  *Id* at 232;

Strong Decl, ¶ 14.

      Nickerson investigated Strong's allegations after their meeting, but the conclusion of her

investigation is unclear.  Nickerson Depo, pp. 182, 187-90.  Dice allegedly wanted Strong back

24 - FINDINGS AND RECOMMENDATIONS

at work.  Dice Depo, pp. 97-98.  Dice prepared a one-year evaluation for Strong rating him as a

"performer," but never gave it to him.  Youman Depo, pp. 80-83; Ostroff Decl, Exhibit 12.

   Neither Nickerson nor anyone else at Home Depot prepared any termination paperwork

related to Strong's departure.  Nickerson Depo, p. 239.  Nickerson did not get back to Strong.

Strong Decl, ¶ 14.  On June 8, 2005, Strong called Home Depot's "Awareness line" and reported

he had been subjected to racially insensitive remarks by Dice and Youman.  Strong Depo, p. 247.

When asked at deposition whether he believed he was still employed at that point, he and

responded:  "At that stage of the game, I didn't know what was my employment status.  I was

still in limbo. I hadn't heard from [Nickerson]. I hadn't heard from anyone in regards to my job

status, so how was I to know."  *Id* at 248.

   **F.    Subsequent Employment**

   On June 2, 2005, Strong applied for work with the David Douglas School District.  In his

application for employment he stated that he was still currently employed by Home Depot, and

confirmed in writing that all statements in the application were true and correct.  Ostroff Decl,

Exhibit 13.

   Strong was hired as a full-time custodian by the David Douglas School District on July 1,

2005, and has remained there since.  Strong Depo, pp. 13, 17-18.  The job pays $15.04 an hour,

and includes medical and dental benefits as well as a retirement plan.  *Id* at 13-14.  Strong's pay

at Home Depot was $9.50 an hour.  Ostroff Decl, Exhibit 3, p. 3.

///

///

///

25 - FINDINGS AND RECOMMENDATIONS

## FINDINGS

### I.    Race and Age Discrimination Claims (First, Second & Fourth Claims)

Adams and Strong allege disparate impact race discrimination claims under Title VII, Section 1981, and ORS 659A.030.[6]  Strong also contends he was discriminated against on the basis of his age in violation of the ADEA and ORS 659A.030(1)(a) & (b).

### A.    Race and Age Discrimination Statutes

With respect to race, Title VII prohibits employers from discriminating against "any individual with respect to . . . compensation, terms, conditions, or privileges of employment, because of such individual's race, color, . . . or national origin."  42 USC § 2000e-2(a)(1). Oregon's parallel employment discrimination statute, ORS 659A.030, also makes it unlawful to discriminate against protected individuals on the basis of race in the compensation, terms, conditions, or privileges of employment.[7]

Section 1981 provides as follows:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 USC § 1981(a).

---

[6]  While Home Depot also moved for summary judgment against plaintiffs' hostile work environment claims, Adams and Strong have not alleged such claims.  *See* Adams' Memorandum in Opposition, p. 20 n22; Strong's Memorandum in Opposition, p. 16, n 8.  Accordingly, the court will disregard Home Depot's motions on this ground.

[7]  Although ORS 659A.030 was amended by 2007 Oregon Laws Ch. 100 (SB 2), both the former and the current version prohibit discrimination on the basis of race.

Although Section 1981 does not itself use the term "race," it is intended and has been interpreted to prohibit race discrimination. *Keating v. Carey*, 706 F2d 377, 384 (2nd Cir 1983) (noting that § 1981 was enacted in an effort to address the problem of racial discrimination against African-Americans). Moreover, the 1991 amendments to Section 1981 have clarified the meaning of the term "make and enforce contracts" in that provision:

> For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

42 USC § 1981(b).

In accordance with those amendments, Section 1981 applies in the employment context to prohibit race-based employment discrimination, including employment discrimination stemming from a hostile work environment. *Manatt v. Bank of Am., NA*, 339 F3d 792, 797 (9th Cir 2003). Claims under § 1981 are analyzed using the same legal principles as are claims under Title VII. *Id*.

With respect to age, the ADEA makes it unlawful for an employer to hire or discharge any individual or otherwise discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of the individual's age. 29 USC § 623(a)(1). Protection under the ADEA extends to all individuals who are at least 40 years old. 29 USC § 631(a). Oregon's parallel statute, ORS 659.030A(1)(a) & (b), also prohibits age discrimination, but offers protection to all individuals over the age of 18.

///

///

**B.    Disparate Treatment On the Basis of Race and/or Age**

27 - FINDINGS AND RECOMMENDATIONS

1.    **Legal Standard**

Disparate treatment is demonstrated when "[t]he employer simply treats some people less favorably than others because of their race, color, religion [or other protected characteristics]." *Enlow v. Salem-Keiser Yellow Cab, Inc.,* 389 F3d 802, 812 (9th Cir 2004), *cert denied*, 544 US 974 (2005) (internal quotations and citations omitted).  Employment discrimination claims are generally analyzed using the framework articulated in *McDonnell Douglas Corp. v. Green*, 411 US 792 (1973).  Pursuant to that framework, in order to establish a *prima facie* case of discrimination, a plaintiff must offer evidence that "'give[s] rise to an inference of unlawful discrimination.'"  *Godwin v. Hunt Wesson, Inc.*, 150 F3d 1217, 1220 (9th Cir 1998), quoting *Texas Dep't of Comm. Affairs v. Burdine*, 450 US 248, 256 (1981).  A *prima facie* case of discriminatory discharge requires a plaintiff to prove that he was:  (1) a member of the protected class; (2) performing his job satisfactorily; (3) discharged; and (4) replaced by an employee not within their protected class.  *See Pejic v. Hughes Helicopters, Inc.,* 840 F2d 667, 672 (9th Cir 1988) (Title VII); *Manatt,* 339 F3d at 797 (adopting Title VII standards for Section 1981 race discrimination claims); *Harris v. Pemeco Corp.*, 170 Or App 164, 176, 12 P3d 524, 532 (2000) (because ORS Chapter 659A was modeled after Title VII, federal cases under Title VII are instructive).

If a plaintiff establishes a *prima facie* case, then the burden shifts to the defendant, who must proffer a legitimate, nondiscriminatory reason for its employment decision.  *Chuang v. Univ. of Cal. Davis, Bd. of Trs.*, 225 F3d 1115, 1123-24 (9th Cir 2000); *Godwin*, 150 F3d at 1220.  If the defendant provides a legitimate reason, then the plaintiff must show that the defendant's proffered reason is pretextual "'either directly by persuading the court that a

discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *Chuang*, 225 F3d at 1124, quoting *Burdine*, 450 US at 256.

A plaintiff who relies on circumstantial evidence of discrimination to demonstrate a violation of Title VII, ADEA and/or Section 1981 must satisfy the *McDonnell Douglas* burden-shifting framework. *See Brooks v. City of San Mateo*, 229 F3d 917, 928 (9th Cir 2000); *Manatt*, 339 F3d at 797. However, when a plaintiff offers direct evidence of discrimination, then the *McDonnell Douglas* test is inapplicable. *Enlow*, 389 F3d at 812 (internal quote marks, citations, and emphasis omitted); *see also Trans World Airlines, Inc. v. Thurston*, 469 US 111, 121 (1985); *AARP v. Farmers Group, Inc.*, 943 F2d 1996, 1000 n7 (9th Cir 1991), *cert denied*, 502 US 1059 (1992).

Direct evidence of discrimination is "evidence of conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude sufficient to permit the fact finder to infer that the attitude was more likely than not a motivating factor in the employer's decision." *Enlow*, 389 F3d at 812. Circumstantial evidence is "evidence that requires an additional inferential step to demonstrate discrimination." *Coghlan v. American Seafoods Co., LLC*, 413 F3d 1090, 1095 (9th Cir 2005).

> The distinction between direct and circumstantial evidence is crucial, because it controls the amount of evidence that the plaintiff must present in order to defeat the employer's motion for summary judgment. Because direct evidence is so probative, the plaintiff need offer "*very little*" direct evidence to raise a genuine issue of material fact. But when the plaintiff relies on circumstantial evidence, that evidence must be "specific and substantial" to defeat the employer's motion for summary judgment.

*Id* (citations and footnotes omitted) (emphasis added).

29 - FINDINGS AND RECOMMENDATIONS

Oregon law prohibiting race and age discrimination (ORS 659A.030) does not follow the *McDonnell Douglas* burden shifting formula even when the claims are premised on circumstantial, rather than direct, evidence of discrimination. *Callan v. Confed. of Ore. Sch. Admin.*, 79 Or App 73, 78 n3, 717 P2d 1252, 1254 n3 (1986). Oregon courts have, however, acknowledged that the requirements for a *prima facie* case of discrimination based on circumstantial evidence under federal law also apply to state law claims. *See Henderson v. Jantzen*, 79 Or App 654, 658, 719 P2d 1322, 1324, *rev denied*, 302 Or 35, 726 P2d 934 (1986), citing *Burdine,* 450 US at 253. In other words, a plaintiff who establishes a *prima facie* case of discrimination under Title VII or ADEA survives summary judgment on the corresponding discrimination claim under ORS 659A.030 without having to satisfy the next steps of the *McDonnell Douglas* framework.

Nevertheless, based on *Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F3d 1080, 1091 (9th Cir 2001), Home Depot contends that the *McDonnell-Douglas* burden shifting applies here to plaintiffs' Oregon employment discrimination claims. *Snead* holds that federal courts with diversity jurisdiction must apply the *McDonnell Douglas* burden-shifting framework to claims under ORS 659A.030. This court has previously found *Snead* inapplicable to state discrimination claims premised on supplemental jurisdiction. *See Pascoe v. Mentor Graphics Corp.*, 199 F Supp 2d 1034, 1052 n4 (D Or 2001). Citing *Echols v. Lokan & Assoc., Inc.*, 2007 WL 756691 * 10 (D Or March 7, 2007), Home Depot argues that the burden-shifting framework applies to state claims regardless of whether jurisdiction is governed by diversity or federal question. However, *Echols* simply held that because the plaintiff satisfied her *prima facie* case

under Title VII, she also met her *prima facie* case under ORS 659A.030 and denied summary

judgment to employer on the state claim.

2.      <strong><u>Adams' Race Discrimination Claims (First and Fourth Claims)</u></strong>

Adams contends that he has presented sufficient direct evidence to create the requisite

inference that Home Depot discriminated against him on the basis of race.  He relies on the

following statements by his supervisors, Dice and Youman:

(1) shortly after Strong started working at Home Depot, Youman said to Strong in

Adams' presence:  "Get your ass moving or I'm going to crack the whip" (Adams Decl,

¶ 9d);

(2)  in July 2004, Dice told Adams that his wife's brother and mother were Aryan nation

members and would walk around with shotguns (*id* at ¶ 9e);

(3) in mid 2004, Dice said to Adams:  "Come on, Darkman, hurry up"  (*id* at ¶ 9f);

(4) at different times, Adams heard Dice call Dachelbai a "darkman" (*id* at ¶ 9g);

(5) on March 9, 2005, Youman said to Adams and Strong: "Hey, you monkeys done

yet?" (*id* at ¶ 9l);

(6) later on March 9, 2005, Youman told Adams, in Strong's presence, to go home and

eat some bananas (*id* at ¶ 9m).

The first and second statements do not constitute direct evidence of discrimination

because they require an additional step to infer a racial slur.  Depending on the context, the

reference to cracking a whip could be considered an innocent expression to motivate a person to

action or, alternatively, as a reference to slavery.  Similarly, depending on the context, the

comment about membership in the Aryan Nation could be an innocent conversation or,

alternatively, an intentional reference to the white supremacist ideology espoused by that group. *See Ash v. Tyson Foods, Inc.*, 546 US 454, 456 (2006) (in race discrimination cases, whether or not a comment is reasonably perceived as offensive may depend on various factors including context, inflection, tone of voice, local custom, and historical usage).  Home Depot also offers a non-discriminatory explanation for the "bananas" statement based on Youman's alleged concern about Adams' health and suggestion to eat some bananas in order to increase his potassium levels.  Even if these statements are not considered, no reasonable person could doubt that the remaining three statements referring to Adams as "Darkman" and a monkey are racial slurs and constitute direct evidence of racial discrimination.  *See Chuang*, 225 F3d at 1127 ("two Chinks" in the department were more than enough).

To withstand summary judgment, Adams must establish that these statements were made "by persons involved in the decision-making process" and "may be viewed as directly reflecting the alleged discriminatory attitude sufficient to permit the fact finder to infer that the attitude was more likely than not a motivating factor in the employer's decision."  *Johnson v. The Evangelical Lutheran Good Samaritan Soc.*, 2005 WL 2030834 (D Or Aug 23, 2005), quoting *Enlow*, 389 F3d at 812 (internal quotation marks omitted).  Home Depot argues that these comments were not made in connection with or tied to Adams' termination and were not made by Nickerson, the alleged decision-maker.

Contrary to Home Depot's position, the Ninth Circuit has recognized that a nexus to the particular employment decision is not always required.  In *Chuang*, the decision-maker laughed after a co-worker remarked that "two Chinks" in the department were more than enough.  Although the remark referred to someone other than the plaintiff and did not pertain to the

particular employment decision at issue, the court found it constituted adequate evidence of discriminatory intent on the part of a decision-maker.  In *Cordova v. State Farm Ins. Cos.*, 124 F3d 1145, 1149 (9th Cir 1997), the Ninth Circuit similarly held a decision-maker's alleged comments that a co-worker was a "dumb Mexican" and hired because he was a minority were strong evidence of discriminatory animus on the basis of national origin, even though the remarks were not about the plaintiff or the decision as to whether to promote her.  In both of those cases, the court held that the egregious comments constituted direct evidence of a discriminatory motive underlying the employment decision.

Here some of the alleged comments were directed at plaintiffs' job performance ("Hurry up, Darkman," and "Are you monkeys done yet?").  While stray remarks are ones "uttered in an ambivalent manner," there is nothing ambivalent about the statements at issue here.

### a.    Adverse Employment Decisions

The parties agree that Adams' termination constitutes an adverse employment decision. While Adams' briefing refers to other types of adverse employment actions, Adams does not allege that he was the subject of these other types of adverse employment actions.

### b.    Whether Dice and/or Youman Were Decision-Makers

Where there is a "common actor," a presumption of non-discrimination is created. *Bradley v. Harcourt, Brace and Co.,* 104 F3d 267, 270-71 (9th Cir 1996) (citation omitted) (holding that "where the same actor is responsible for both the hiring and firing of a discrimination plaintiff . . . a strong inference arises that there was no discriminatory motive."). The common actor presumption exists only where an employee in a protected class is hired and fired by the same supervisor in a relatively short period of time.  *Id*; *Roberts v. Separators, Inc.*,

172 F3d 448, 452 (7th Cir 1999) (being fired within one year of being hired constitutes "a relatively short period of time"); *Chiaramonte v. Fashion Bed Group, Inc.*, 129 F3d 391, 399 (7th Cir 1997), *cert denied*, 523 US 1118 (1998) (being fired within two years of being hired constitutes a "relatively short period of time").

It is uncontested that Nickerson both hired and fired Adams and that her two employment decisions occurred less than 22 months apart. These facts create a "strong inference" that Nickerson was not motivated by discriminatory animus when she decided to discharge Adams. However, Nickerson did not have day-to-day contact with Adams or direct knowledge of his performance. Instead, Dice approached Nickerson, told her that Adams had attendance issues, and recommended termination. Because Home Depot's attendance policy allowed supervisors to use common sense and reasonable discretion in applying it, Dice had discretionary powers in deciding which of Adams' absences could be excused. Therefore, the information that he provided to Human Resources, which ultimately led to Adams' discharge, was subjective in nature. Exercising his discretion as allowed by the attendance guidelines, Dice could have refrained from issuing one or more of the disciplinary notices. For example, Adams did call in before his shift both on March 9 and October 18, 2004, although he failed to call back again after his shift started. Neither of these incidents necessarily constitutes a No Call/No Show which is not calling in at all when "not reporting to work when scheduled at least one hour after their designated start time."

"Even if the manager was not the ultimate decision maker [in denying a promotion], that manager's motive may be imputed to the company if the manager was involved in the [employment] decision." *Bergene v. Salt River Proj. Agr. Improvement & Power Dist.*, 272 F3d

1136, 1141 (9th Cir 2001); *see also Willis v. Marion Co. Auditor's Office*, 118 F3d 542, 547 (7th Cir 1997) ("there are situations in which the forbidden motive of a subordinate employee can be imputed to the employer because, under the circumstances of the case, the employer simply acted as the 'cat's paw' of the subordinate") (citation omitted); *Long v. Eastfield College*, 88 F3d 300, 307 (5th Cir 1996) ("The degree to which [the final decision maker's] decisions were based on his own independent investigation is a question of fact").  In *Bergene*, the plaintiff offered direct evidence of retaliation by her former supervisor.  Although another person was ultimately responsible for selecting the new foreman, there was evidence that the former supervisor advised the decision maker to remove one qualification as a prerequisite for the foreman position, which was disadvantageous to the plaintiff, and provided the decision maker with an assessment of the plaintiff's abilities.  In *Long*, the decision-maker (a college president) simply rubber-stamped the recommendations of two department supervisors who were aware of the plaintiffs' protected actions at the time they made their recommendations of termination.  The college submitted evidence that the president reviewed written statements from five employees in addition to the two department supervisors.  However, the plaintiff submitted a letter from the college president stating that he made a decision to uphold the recommendation of plaintiffs' supervisor to terminate plaintiffs' employment.  The court found that this created a genuine issue of material fact precluding summary judgment.  In *Shager v. Upjohn Co.*, 913 F2d 398, 405 (7th Cir 1990), an age discrimination case, the plaintiff submitted evidence that his supervisor recommended to the committee which reviews personnel actions that he should be fired; the supervisor was the district manager; he exaggerated the plaintiff's deficiencies; the committee's deliberations were brief and no member of the committee who was deposed could remember having considered the

issue.  The court denied summary judgment to employer, finding that the plaintiff had offered

enough evidence to create a fact issue as to whether the committee was acting as a "conduit to

[the supervisor's] prejudice."  913 F2d at 405.

Viewing the facts most favorably to Adams, Dice was a key contributor to the decision to

terminate Adams because he influenced Nickerson's decision to fire Adams by recommending

termination and providing her with evidence of a subjective nature.  In addition to the

discriminatory statements he personally made, Dice was also aware of the discriminatory

statements made by Youman against the two African-Americans in the department (Adams and

Strong), and did nothing to discipline Youman or counsel him.  As a result, a discriminatory

motive by Dice may be imputed to Home Depot.

Home Depot contends that Adams cannot prevail absent evidence that Dice treated a non-

African-American employee better than he treated Adams with respect to the attendance policy.

However, where direct evidence of discrimination is provided, summary judgment is not the

proper method to evaluate Home Depot's alleged non-discriminatory motive.

This court finds that Adams has presented sufficient direct evidence to raise a genuine

issue of material fact that Adams was discriminated on the basis of his race.  Therefore, Home

Depot's motion for summary judgment against Adams' First and Fourth claims should be denied.

### 3.    Strong's Race and Age Discrimination Claims (First, Second, and Fourth Claims)

Because Strong is claiming both race and age discrimination, the court must examine the

evidence of race and age discrimination singly and in combination.  An African-American who

is at least 40 years old may be "subject to a set of stereotypes and assumptions suffered neither

by [whites] nor by [African-Americans under the age of 40]."  *See Lam v. Univ. of Ha.*, 40 F3d

36 - FINDINGS AND RECOMMENDATIONS

1551, 1562 (9th Cir 1994) (an Asian woman alleging both race and gender discrimination "may be targeted for discrimination 'even in the absence of the discrimination against [Asian] men or white women'").

In support of his race and age discrimination claims, Strong relies on the following statements:

(1)  shortly after Strong was hired, Youman told him to "[g]et your ass moving or I'm going to crack the whip" (Strong Decl, ¶ 11a);

(2)  within a couple of weeks being hired, Youman told him that he felt Strong was too old to handle the type of work in the Freight Department and needed to seek other employment outside of Home Depot (Strong Decl, ¶ 11b);

(3)  within a month of being hired, Dice told him to consider working in another department where the type of work and the work load would be more suitable for someone his age (*id* at ¶ 11c);

(4)  within a month or two of being hired, Strong heard Dice refer to Adams as "Darkman" (*id* at ¶ 11d);

(5)  after Strong's 90-day review and when he inquired about moving from 32 hours a week to full-time employment, Dice told him that he wanted someone younger to work full-time (*id* at ¶ 11e);

(6)  in or about January 2005, Youman told him that he was not the type of person Home Depot was looking for, was too old, should seek work elsewhere, did not qualify for a transfer to the Garden Department, did not qualify to be a full-time employee, was going

37 - FINDINGS AND RECOMMENDATIONS

nowhere with the company and should seek other employment more suitable to a person his age (*id* at ¶ 11l);

(7) on March 9, 2005, Youman asked Adams and Strong "Are you monkeys done yet?" (*id* at ¶ 11m); and

(8) later on March 9, 2005, Youman told Adams in Strong's presence to go home and eat some bananas (*id* at ¶ 11n).[8]

As discussed above with respect to Adams, the first and last statements do not represent direct evidence of discrimination because the require an extra inferential step to become racial slurs. Nevertheless, the remaining statements represent direct evidence of a discriminatory animus on the basis of age and/or race. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 US 133, 148 (2000) (evidence that the decision maker told the plaintiff that he was "too damn old to do the job" may be sufficient to support a jury verdict in an age discrimination action). As with Adams, Home Depot argues that the comments were mere stray remarks not made in connection with or tied to any adverse employment action and were not made by Nickerson, the alleged decision-maker. For the same reasons as above, this court disagrees.

### a.    Adverse Employment Actions

First, it is necessary to determine what adverse employment action against Strong are actionable. Adverse employment actions include "termination, dissemination of a negative employment reference, issuance of an undeserved negative performance review and refusal to consider for promotion." *Brooks*, 229 F3d at 928. However, a less than perfect performance

---

[8] Strong also relies on another derogatory remark to Strong about his age on March 17, 2005, (Strong Decl, ¶ 11o), which this court has stricken as conclusory.

evaluation will not suffice absent an allegation that the evaluation was disseminated or the employee was demoted, stripped of job responsibilities, handed different or more burdensome work responsibilities, denied any raises, reduced in salary or any other benefit, or fired or suspended. *Kortan v. California Youth Auth.*, 217 F3d 1104, 1113 (9th Cir 2000).

Strong briefly and vaguely alleges that he suffered the following adverse employment actions as a result of race and age discrimination: "[u]nequal application of discipline, including write-ups or other disciplinary measures that lead to termination, denials of requests to work full-time, as well as suspensions and terminations themselves, such as are present in the instant case." Strong's Memorandum in Opposition to Defendant's Motion for Summary Judgment, p. 16. The court construes these allegations as referring to Strong's: (1) suspension; (2) termination; and (3) denial of full-time night shift opportunities with Home Depot.

### i. <u>Suspension</u>

Home Depot does not dispute that Dice suspended Strong for "insubordination," but contends that the suspension was not disciplinary in nature and was rescinded in short order by Nickerson. The first argument is based on Nickerson's testimony that Home Depot does not "use suspension as a means of discipline," but rather as "an opportunity to get away from the workplace" and "for everything to cool down." Nickerson Depo, pp. 215-16. The characterization of the suspension as non-disciplinary is bizarre in light of Strong's declaration that he was suspended without pay. Strong Decl, ¶ 13d. A suspension without pay affects the amount of compensation and terms of employment and may constitute an adverse employment action expressly prohibited under Title VII, the ADEA, and ORS 659A.030.

///

39 - FINDINGS AND RECOMMENDATIONS

### ii.    <u>Termination</u>

Home Depot contends that Adams was never terminated and was so told four times, twice by Dice and twice by Nickerson.  At the April 5, 2005 meeting, Nickerson offered him his old job back and talked to him about the possibility of a day job.  Strong Depo, pp. 227-31. After Nickerson told Strong that the issue of compensation was out of her hands, he "asked her when will I be hearing from her, when will she be letting me know when I can return to work, and she said just to be expecting to hear from her sometime soon." *Id* at 232.  Two months later, he had still not heard from Nickerson and no one at Home Depot had completed his termination paperwork.  In July 2005, Strong accepted other employment.

Viewing the facts in the light most favorable to Strong, a question of fact exists as to whether he was terminated or merely continued to be suspended without pay.  Nickerson initially offered him his old job back, but may have rescinded that offer when he inquired about compensation, and instead told him to go home and wait for her call, which never came.  If true, this would not amount to a rescission of the suspension, but rather an indefinite, unpaid suspension, if not a constructive discharge, and, as such, would certainly constitute an adverse employment action.

### iii.    <u>Denial of Full-Time Position</u>

Strong also contends that Home Depot's failure to hire him as a full-time employee constitutes an adverse employment action.  Home Depot makes two arguments why Strong cannot rely on a failure to be hired full-time.

First, it contends that Strong made himself unavailable for full-time positions in September 2004.  However, Strong never admitted that he made himself unavailable for full-time

work.  He simply explained that his part-time job sometimes required him to work up to 40 hours

a week and that after he was told that no full-time positions were available, he requested a

reduction in his part-time hours:

> A. Yeah, this is after my conversation with Mr. Dice in regards to my full-
> time status. . . . I figured, well, if I'm not going to be a full-time status,
> then I won't work in a full-time situation, because they were working me
> sometimes 40 hours.
> Q.  So what was different about being worked 40 hours and having a full-
> time status?
> A.  Well, if I couldn't get the eight hours, the full-time status, then I
> should be - - I should cut my work load down to give me time to look for
> other employment, because I needed full-time work.  I didn't need part-
> time work.  I needed benefits.  I need something decent with a retirement
> and everything.  This didn't offer me anything.

Strong Depo, p. 235.

In other words, when his request for full-time employment was refused, Strong tried to

make the best of his situation.  Had he later been offered full-time employment, there is no

evidence that he would have refused that offer.

Second, Home Depot argues that no full-time freight associate positions in the night shift

were available during Strong's employment with Home Depot.  While Home Depot denies there

were any full time freight associate positions on the night shift during Strong's employment,

Strong points to three full-time positions filled by Lisa Crow ("Crow"), Garry Dunbar

("Dunbar"), and Larry Hopkins ("Hopkins").

Crow was hired part-time on June 6, 2003, and became a full-time employee on

September 18, 2003.  Second Nickerson Decl, ¶ 4; Steenson Decl, Exhibits 15, 23.  Because

Crow was hired full-time well before Strong was hired on April 12, 2004, her hire does not assist

Strong.

Similarly, the hiring of Hopkins does not assist Strong.  Hopkins was hired on March 2, 2005, as a part-time employee in the freight department.  Second Nickerson Decl, ¶ 6. According to Nickerson, Hopkins never became a full-time employee.  *Id* & Exhibit 1.[9]  His last day of employment was May 12, 2005.  Steenson Decl, Exhibit 15.  While Strong relies on the punch detail reports showing  Hopkins' status as "FT standards," Nickerson has explained that it is simply a coding error.  Second Nickerson Decl, ¶ 6.  Strong has not refuted this explanation which is consistent with Home Depot's practice of hiring employees part-time and later moving them to full-time.

Dunbar was hired on April 26, 2003, as a part-time sales associate, and became a full-time employee on December 21, 2003.  *Id* at ¶ 5.  The record is inconsistent to when Dunbar was transferred to the freight department as a full-time employee.  *Compare id* at ¶ 4 (April 21, 2004) *with* Steenson Decl, Exhibit 15 (July 19, 2004).  Viewing the facts most favorably to Strong, Dunbar's full-time employment in the freight department began on July 19, 2004, a few days *after* Strong requested full-time employment (which occurred approximately a week after his July 3, 2004 evaluation).  Therefore, the hiring of Dunbar is sufficient to create a material issue of fact as to whether full-time employment was available in the freight department at the same time Strong was told that no full-time hours were available.

///

///

///

_____

[9] Exhibit 15 reflects that he became an employee on March 12, 2005, rather than March 2, 2005.  Steenson Decl, Exhibit 15.

**b.** **Whether Dice and/or Youman Are Decision Makers**

The remaining issue is whether Dice and/or Youman's discriminatory motive influenced Nickerson's decision to suspend and/or terminate Strong, as well as not to offer him full-time employment.

Home Depot argues that the decision not to move Strong to full-time work was made by Nickerson. Both Dice and Youman told Strong they did not believe he was qualified to be a full-time employee. *See* Strong Decl, ¶¶ 11e, 11l. Nickerson told Strong that he would be considered for full-time work after a performance evaluation. Strong Depo, pp. 24-26; Nickerson Depo, pp. 196-98. Strong's performance evaluations were conducted by Dice. Dice had the opportunity to influence those performance evaluations, and hence Nickerson's decision to offer Strong full-time employment, and Strong has offered evidence that full-time hours were available during his employment.

Dice was the decision-maker responsible for Strong's initial suspension. His role with respect to Strong's continued suspension after the April 5, 2005 meeting, which may or may not have ripened into his termination, is unclear. Assuming that Nickerson did a further investigation, as she promised, then it can reasonably be inferred that she consulted with Dice about the continuing suspension. In any event, but for Dice's initial suspension, Strong would not have been suspended indefinitely when he declined Nickerson's offers to return to work under conditions that he deemed unacceptable.

In summary, Strong has offered some direct evidence of discriminatory animus on the basis of race and/or age by supervisors involved in the decision-making process to inflict his

suspension and/or termination, as well as the failure to hire him full-time.  Thus, Home Depot's

motion for summary judgment on Strong's First, Second, and Fourth Claims should be denied.

**II.    Race and Age Retaliation Claims (Third Claim)**

    **A.    Legal Standard**

Title VII prohibits discrimination against any applicant or employee "because he has

opposed any practice made an unlawful employment practice by [Title VII/ADEA]."  42 USC

§ 2000e-3(a).  When a plaintiff offers *direct* evidence of retaliation, then the *McDonnell Douglas*

test is inapplicable.  *Enlow*, 389 F3d at 812.  Otherwise, under *McDonnell Douglas*, in order to

establish a *prima facie* case of retaliation under Title VII/ADEA, a plaintiff must show that:

(1) he engaged in a protected activity (opposition to discrimination); (2) he was subjected to an

adverse employment decision; and (3) there is a causal link between the protected activity and

the adverse action.  *Yartzoff v. Thomas*, 809 F2d 1371, 1375 (9th Cir 1987).  Once the plaintiff

establishes a *prima facie* case of retaliation, the burden shifts to the defendant to articulate a

legitimate non-retaliatory reason for the adverse employment action.  *Wallis*

*v. J.R. Simplot Co.*, 26 F3d 885, 889 (9th Cir 1994) (citation omitted).

If the employer produces sufficient evidence to support a non-retaliatory explanation for

its decision, the burden-shifting framework disappears, and the plaintiff  bears the full burden of

raising a genuine factual question whether, viewing the evidence in the light most favorable to

him, the employer intentionally retaliated against him.  Although the presumption of retaliation

"drops out of the picture" once the defendant meets its burden of production, "the trier of fact

may still consider the evidence establishing the plaintiff's *prima facie* case 'and inferences

properly drawn therefrom'" on whether the employer's explanation is pretextual.  *Reeves*, 530

US at 143 (citation omitted).

ORS 659A.030(1)(f) makes it an unlawful employment practice "for an employer to

discharge, expel or otherwise discriminate against any other person because that other person

has opposed any unlawful practice, or because that other person has filed a complaint, testified

or assisted in any proceeding under this chapter or has attempted to do so."  Under Oregon law,

the protected activity must have been a "substantial factor" in the adverse action.  *Seitz v. Albina*

*Human Res. Ctr.*, 100 Or App 665, 675-76, 788 P2d 1004, 1010 (1990).  If a plaintiff meets his

*prima facie* burden, then his state retaliation claim cannot be dismissed on summary judgment

because the *McDonnell Douglas* burden shifting analysis is not applicable.  *Callan*, 79 Or App at

77, 712 P2d at 1254,

    **B.**    **Analysis**

        **1.**    **Protected Conduct**

            **a.**    **Adams**

Adams contends that he engaged in protected activities by making multiple complaints

about Youman's and Dice's racially offensive comments:

> In or about mid-2005, ASM Dice made an inappropriate comment when
> he said to me "Oh, you want some loving?  I got some loving for you."
> When I complained, he just laughed it off and said his wife would "kick
> my ass" if she knew he talked like that.
>              * * *
> Another time ASM Dice whistled at me in a sexual way.  I told him "I'm
> not with that.  You should leave that at home for your wife."  He just gave
> me a little look and walked away.
>              * * *
> I complained several times to ASM Dice about how I was being treated by
> DH Youman and the poor work environment he created for me.  I

45 - FINDINGS AND RECOMMENDATIONS

> complained that Mr. Youman talked to me like I was a kid and was more
> demanding than was fair.  Mr. Dice's response was "It's better than
> flipping burgers."  The other times I complained to Mr. Dice about how
> Mr. Youman treated me I received a similar response.

Adams Decl, ¶¶ 9i, 9j, 10.

Home Depot denies that these complaints constitute protected conduct.  This court agrees.  The first two complaints in response to sexually provocative comments were not connected to any complaint by Adams of being subjected to race discrimination.  The remaining complaints about Youman's conduct are vague enough that a listener would not be put on notice that Adams was complaining about unlawful conduct.  Although Adams now urges the court to infer that the subject of the complaints was Youman's racial discriminatory conduct, Adams answered "no" to the question whether he claimed to anyone at Home Depot that "Youman was talking to [him] and giving [him] orders because of his race."  Adams Depo, p. 112.  Adams now contends that he testified to his best recollection at that time and was never asked whether he had testified to all the complaints he ever made against anyone at Home Depot.  Adams Decl, ¶ 10 n1.  While that may be the case, Adams was specifically asked whether he complained to anyone about Youman's racially discriminatory remarks and conduct, and answered that he did not.  In light of this testimony, the court is left with no direct or circumstantial evidence that suggests that Adams complained about being subjected to racially discriminatory conduct.  Even if his complaints regarding retaliation were general, rather than specific, he contends that in light of Strong's discriminatory complaints, the jury could infer that Adams was retaliated against.  For the reasons explained above, the argument is unpersuasive.  Thus, Adams' retaliation claim fails.

///

b.    **Strong**

Home Depot does not dispute that Strong engaged in protected conduct when he complained of race discrimination.  Instead, Home Depot contends that Strong's retaliation claims based on age fail because he only complained of "race issues" and not age-based discrimination during his March 22, 2005 meeting.  Strong Depo, p. 164.  However, a retaliation claim can be based on earlier protected conduct.  In January 2005, Strong complained to Youman that he felt he was singling him out, that "he had some race issues and some age issues," which Youman denied.  *Id* at 139, 149.  That same day, Strong repeated both his race and age complaints to Dice.  *Id* at 152.  On March 9, 2005, Strong also complained to Dice about Youman's racist comments against him and Adams and about Youman telling Strong he was too old.  Adams Decl, ¶ 12.  An employee's complaints about the treatment of other employees is considered a protected activity.  *See Thomas v. City of Beaverton*, 379 F3d 802, 811-12 (9th Cir 2004) (citation omitted).

2.    **Adverse Employment Actions**

As discussed above, Strong has also submitted evidence that he suffered the following adverse employment actions:  (1) an initial suspension without pay; (2) a continued suspension which raises an issue of material fact as to whether he was terminated; and (3) a failure to hire for a full-time position.

3.    **Causal Link Between Protected Conduct and the Adverse Employment Actions**

Strong has not addressed what causal link, if any, exists between his protected conduct and the failure to hire him in a full-time position.  He has submitted evidence that as of July

2004, Home Depot had a full-time job available for which he was not hired.  However, there is no evidence that full-time jobs were available at or after the dates of his protected conduct. Therefore, Strong has failed to establish a *prima facie* case that the failure to hire him was in retaliation for his complaints of discrimination.  However, the court finds a causal link between the protected conduct and the other two adverse employment actions of  the initial suspension and the indefinite suspension/termination.

"Temporal proximity between protected activity and an adverse employment action can by itself constitute sufficient circumstantial evidence of retaliation in some cases."  *Bell v. Clackamas Co.*, 341 F3d 858, 865 (9th Cir 2003) (citations omitted).  However, the timing must be "very close."  *Clark Co. Sch. Dist. v. Breeden*, 532 US 268, 273, *reh'g denied*, 533 US 912 (2001) (internal quotation marks and citations omitted).  The Ninth Circuit has declined to infer causation from timing alone when the link between protected activity and the adverse employment action was too remote.  *Villiarimo v. Aloha Island Air, Inc.*, 281 F3d 1054, 1065 (9th Cir 2002) (10 and 18 month gap too long); *Allen v. Iranon*, 283 F3d 1070, 1078 (9th Cir 2002) ("an eleven month gap in time is within the range that has been found to support an inference that an employment decision was retaliatory") (citations omitted).  On the other hand, while there is no bright line rule, "three to eight months is easily within the time range that supports an inference of retaliation."  *Coszalter v. City of Salem*, 320 F3d 968, 977 (9th Cir 2003). Furthermore, finding that time periods between three and eight months are too long is erroneous when other circumstances in addition to proximity in time support an inference of retaliation. *Coszalter*, 320 F3d at 977.

In light of these decisions, a one day to two month gap between Strong's protected activities (January and March 2005 complaints) and the adverse employment actions of suspension (March 2005) and possibly termination (March or July 2005) create a strong inference of retaliation.

Home Depot argues that temporal proximity is insufficient to create a genuine issue of fact where unrebutted evidence shows that the decision-maker had no knowledge that the employee engaged in protected conduct.  *See Brungart v. BellSouth Telecomm., Inc.*, 231 F3d 791, 799 (11th Cir 2000), *cert denied*, 532 US 1037 (2001).  However, issues of fact exist as to whether the decision-maker had knowledge of Strong's protected conduct.  Strong has produced evidence that both Youman and Dice were well aware of Strong's complaints about their treatment of him as racist and ageist.  Dice was the decision-maker who suspended Strong.  Although Nickerson continued the suspension, it is reasonable to infer that Dice or Youman may have influenced Nickerson's alleged failure to call Strong back and offer him a job guaranteeing that he would no longer be discriminated against by Dice or Youman.

### 4.    <u>Conclusion</u>

Because Adams has failed to meet his *prima facie* burden, Home Depot's motion for summary judgment on his Third Claim should be granted.

In contrast, Strong has produced sufficient evidence to meet his *prima facie* case of retaliation as to his initial and continued suspension.  Questions of fact surround Home Depot's proffered non-retaliatory reasons for the adverse employment actions.  In light of the close temporal proximity between the protected conduct and the adverse employment actions, as well

as direct evidence of race and age discriminatory animus, Home Depot's motion for summary

judgment on Strong's Third Claim should be denied.

### III.    <u>Workers' Compensation Discrimination Claim (Sixth Claim)</u>

#### A.    <u>Legal Standard</u>

Oregon law makes it "an unlawful employment practice for an employer to discriminate

against a worker with respect to hire or tenure or any term or condition of employment because

the worker has applied for benefits or invoked or utilized the procedures provided for in ORS

chapter 656 or has given testimony under the provisions of those laws." ORS 659A.040(1). To

establish a *prima facie* case for workers compensation discrimination under 659A.040, the

plaintiff must show that: "(1) the plaintiff invoked the workers' compensation system;

(2) that the plaintiff was discriminated against in the tenure, terms or conditions of employment;

and (3) that the employer discriminated against the plaintiff in the tenure or terms of employment

because he or she invoked the workers' compensation system." *Williams v. Freightliner, LLC*,

196 Or App 83, 90, 1000 P3d 1117, 1121 (2004) (citation omitted). Oregon courts have rejected

the burden shifting analysis in *McDonnell Douglas* in cases involving workers' compensation

discrimination. *Id*, citing, among others, *Callan*, 79 Or App at 77, 712 P2d at 1254. Therefore,

Adams need only satisfy a *prima facie* case of workers' compensation discrimination for this

claim to survive summary judgment.

#### B.    <u>Analyis</u>

On March 9, 2005, Adams injured himself while stocking freight and suffered severe

cramping in his arms, legs, lower back, neck, shoulders and feet, and told Youman about the

injury. Adams invoked the workers' compensation system on March 10, 2005, when he reported

his absence to an unidentified Home Depot manager due to his injury.  He was terminated the next day on March 11, 2005, when he returned to work.

The Ninth Circuit has recognized that temporal proximity may be enough to support a reasonable inference of retaliation (or in this case, a reasonable inference that the invocation of the workers' compensation system was a substantial factor in Home Depot's decision to terminate him).  *See Coszalter*, 320 F3d at 977 (three to eight months is easily within the time range that supports an inference of retaliation).  However, Home Depot argues that any inference drawn from the one-day temporal proximity is negated by:  (1) Adams' long-documented attendance problems for which he was terminated; (2) the commencement of the process to discharge Adams at least two weeks before his injury; and (3) the lack of knowledge by Nickerson and Dice about Adams' injury prior to his discharge.

Adams denies that his termination was due to his attendance problems.  Although the termination notice stated that Adams had exceeded the six-day guideline, he argues that Home Depot has evidence of only five sick and personal days during the applicable 12-month rolling period:[10] (1) on March 9, 2004, he picked up grandmother at the airport (Ostroff Decl, Exhibits 7 & 8); (2) on October 18, 2004, he had a flat tire on the way to work and called in to report the absence (*id* at Exhibit 9); (3) on January 2, 2005, he took a sick day and reported his absence (*id* at Exhibit 7); (4) on January 17, 2005, he took another sick day and reported his absence (*id*); (5) on February 21, 2005, he took his pregnant girlfriend to the emergency room (*id* at Exhibit 13).

---

[10]  Because Nickerson states that she started the termination process on February 21, 2005, the relevant 12-month period is from February 21, 2004 to February 21, 2005.  Therefore, the February 3, 2004 absence (taking daughter to the emergency room) should not be counted as one of the absences.  Moreover, Nickerson was "positive" that this absence was not considered in the termination decision.  Nickerson Depo, pp. 150-51.

In response, Home Depot points to various counseling sessions and written warnings that Adams received during his employment with Home Depot, especially to a "final" notice he received on January 18, 2005. Ostroff Decl, Exhibit 14. At that time he was reminded of the six-day guideline and warned that any "additional unexcused absence or other attendance issues will result in termination." *Id* at Exhibit 12. Even if a fact issue surrounds Adams' violation of the six-day guideline, Home Depot argues that he clearly accumulated more than 10 points for his No Call/No Shows in the rolling 12-month period and could be terminated for that reason. In certain situation, an employer's "fundamentally different justifications" for discharge is evidence of pretext "since they suggest the possibility that neither of the official reasons is true." *Washington v. Garrett*, 10 F3d 1421, 1434 (9th Cir 1994). Since Adams' termination based on points is not a "fundamentally different justification" for termination based on the six-day guideline, Home Depot contends that no inference of a retaliatory motive can be drawn.

This court need not parse the evidence concerning this issue because Adams cannot show a causal link between his injury and his discharge. First, Nickerson and Dice both testified that the process of discharging Adams began at least two weeks before he suffered his injury (immediately after the February 21, 2005 absence). Adams attempts to cast suspicion on that testimony based on the lack of supporting documentation. Even so, it is undisputed that Nickerson and Dice did not know about Adams' injury until after his discharge. Two days before his termination, Adams reported his injury to Youman. One day before his termination, he also reported it to an unidentified manager. The record contains no circumstantial evidence to permit an inference that Youman advised either Dice or Nickerson about Adams' injury

during the relevant two-day span.  Therefore, Home Depot's motion for summary judgment on the Sixth Claim should be granted.

**IV.    Common Law Wrongful Discharge Claim (Fifth Claim)**

Both Adams and Strong allege that they were terminated on the basis of race and for complaining about racial discrimination.  Home Depot responds that Strong was never actually discharged, and that both wrongful discharge claims on the basis of racial discrimination are precluded by the adequate remedies provided by Section 1981.  As explained above, whether Strong was terminated is a question of fact.  However, Home Depot's second argument is persuasive.

Under Oregon law, "wrongful discharge is an interstitial tort, designed to fill a gap where a discharge in violation of public policy would otherwise not be adequately remedied." *Dunwoody v. Handskill Corp.*, 185 Or App 605, 613, 60 P3d 1135, 1138 (2003).  The legal standard for determining whether a claim for wrongful discharge survives has suffered from a severe lack of uniformity both in Oregon courts and this court.  This court has held that a claim for common law wrongful discharge is not available in Oregon if:  (1) an existing remedy adequately protects the public interest in question; *or* (2) the legislature has intentionally abrogated the common law remedies by establishing an exclusive remedy (regardless of whether the courts perceive that remedy as adequate).  *Draper v. Astoria Sch. Dist. No. 1C*, 995 F Supp 1122, 1128 (D Or 1998), *abrogated in part on other grounds by Rabkin v. Or. Health Sciences Univ.*, 350 F3d 967 (9th Cir 2003).  The Oregon Court of Appeals has found that *both* elements must be established in order to preempt a wrongful discharge claim.  *Olsen v. Deschutes County*, 204 Or App 7, 14, 127 P3d 655, 660, *rev. denied*, 341 Or 80, 136 P3d 1123 (2006) (a "defendant

must demonstrate both that the remedy for violation of [the anti-discrimination statute] is adequate in comparison to the remedy available under a common-law tort action and also that the legislature intended the statute to abrogate the common law"). This court revisited the issue in *Cantley v. DSMF, Inc*., 422 F Supp 2d 1214, 1222 (D Or 2006), and, in the absence of Oregon Supreme Court precedent, adhered to its decision in *Draper*.

Not surprisingly, the parties disagree as to which legal standard should be followed. A federal court is not bound by the decisions of a state intermediate appellate court if it determines that the state's highest court would reach a different conclusion. *McCubbrey v. Veninga*, 39 F3d 1054, 1055 (9th Cir 1994). Here, the Oregon Supreme Court has not conclusively spoken on this issue. As *Olsen* itself recognizes, when a statute is silent with respect to the legislature's intent and an explicit statement is absent, "the existence of adequate remedies can be seen implicitly to establish exclusivity." 204 Or App at 16, 127 P3d at 661. As discussed in *Henry v. Portland Dev. Comm'n*, 2006 WL 4008709 at *6-7 (D Or Oct 18, 2006) (citations omitted), "it is not surprising that [S]ection 1981 fails to express an intent to abrogate or to preserve common law wrongful discharge claims," given that Section 1981 was originally enacted in 1866, while Oregon did not recognize a common law claim for wrongful discharge until 1975. In light of its previous analysis and the lack of contrary persuasive reasons, this court continues to require *either* a show of adequate statutory remedies *or* a specific legislative intent to abrogate the common law, but not both.

Title VII and corresponding state statute allow only limited damages for discriminatory conduct and, therefore, fail to provide adequate remedies that would preclude a common law wrongful discharge claim. However, Section 1981 has no limit on damage awards. *Lawrence v.*

*Louis and Co.*, 2006 WL 278194 *1 (D Or Feb 1, 2006).  Under Section 1981, Adams and

Strong may pursue claims for both race discrimination and retaliation and seek legal and

equitable remedies, including compensatory, as well as punitive damages, and attorney fees.

*Johnson v. Railway Express Agency, Inc.*, 421 US 454, 459-60 (1975);[11] *White v. Washington*

*Pub. Power Supply Sys.*, 692 F2d 1286, 1290 (9th Cir 1982).  Because these remedies are

adequate to protect the public interest, they preclude claims by both Adams and Strong for

wrongful discharge on the basis of racial discrimination.

　　　　Strong also alleges that he was terminated and retaliated against in part because of his

age.  Other than contesting that Strong was terminated, Home Depot does not dispute that the

ADEA and corresponding state statute only allow limited damages for discriminatory conduct on

the basis of age.  In light of the broad damages available under the common law tort of wrongful

discharge, the limited damages under the ADEA and state statute are not sufficiently adequate to

preclude a wrongful discharge claim.

　　　　With respect to Adams' workers' compensation discrimination claim, Adams admits that

he may not assert a separate claim for wrongful discharge based on the same facts supporting his

claim under ORS 659A.040.

　　　　In summary, Home Depot's motion for summary judgment on Adams' Fifth Claim

should be granted as to both race and workers' compensation discrimination, while its motion for

summary judgment on Strong's Fifth Claim should be granted as to claims based on race

discrimination and denied as to claims based on age discrimination.

---

[11] *Johnson* uses the phrase "under certain circumstances" to refer to the availability of punitive damages and attorney's fees, but does not identify any limitations.

V.    **Front and Back Pay Claims**

Home Depot seeks partial summary judgment on both Adams' and Strong's claims for back and front pay.  Back pay is intended to compensate a plaintiff for wages lost because of an employer's discriminatory conduct.  *Ford Motor Co. v. EEOC*, 458 US 219, 230-31 (1982).  "Front pay is the term used to describe damages paid as [prospective] compensation for training or relocating to another position. An award of front pay is made in lieu of reinstatement when the antagonism between employer and employee is so great that reinstatement is not appropriate."  *Fadhl v. City and County of San Francisco*, 741 F2d 1163, 1167 (9th Cir 1984), *overruled on other grounds by Price Waterhouse v. Hopkins*, 490 US 228 (1989).  A discharged employee seeking front and back pay has the duty to mitigate his damages by seeking alternative employment with reasonable diligence.  *Ford*, 458 US at 231; *Caudle v. Bristow Optical Co., Inc.*, 224 F3d 1014, 1020 (9th Cir 2000) (citations omitted).

A.    **Adams**

After leaving Home Depot, Adams obtained substitute employment working in the stockroom of Lamps Plus in Clackamas, Oregon.  In September 2005, Adams accepted a full-time, permanent position at Lamps Plus at the rate of $9.50 an hour.  He worked there until January 2006, when he voluntarily quit so he could join his girlfriend and daughter in Goldendale, Washington, and has not worked since.

Home Depot moves to dismiss Adams' claims for front and back pay from September 30, 2005, forward because he accepted allegedly comparable employment at that time and subsequently failed to mitigate his damages when he voluntarily resigned from that employment.  This court agrees.  At the time of his discharge from Home Depot, Adams was making $9.62 an

56 - FINDINGS AND RECOMMENDATIONS

hour.  His position with Lamps Plus was also full-time, at the rate of $9.50 an hour.  Because the difference in compensation between the two positions is negligible, the Lamps Plus position constitutes comparable employment.  The fact that Adams later had to quit the Lamps Plus position in January 2006 in order to relocate to a smaller job market for family reasons has nothing to do with his termination from Home Depot.  In fact, even if he had continued to work at Home Depot, Adams would have had to quit and relocate for the same family reasons.  Therefore, Adams' claims for front and back pay after September 30, 2005, should be granted.

**B.    Strong**

Strong obtained work as a school custodian less than three months after he stopped working for Home Depot.  He worked part-time for $9.50 an hour at Home Depot, but his new position is full-time, pays $15.04 an hour, and includes medical and dental benefits as well as a retirement plan.

Home Depot moves to dismiss Strong's claims for front and back pay because Strong made himself unavailable for full-time work, was not discharged, refused Home Depot's unconditional offer of reinstatement, *or* later found comparable substitute employment.  The court has already addressed and rejected Home Depot's first two arguments.  However, Home Depot's third argument is persuasive.  On July 1, 2005, Strong found substitute employment that was better than his position with Home Depot because it was full-time, with retirement benefits and considerably better compensation.  At oral argument, counsel for Strong agreed that Strong is not entitled to front and back pay after June 30, 2005.  Therefore, Home Depot's motion on this ground should be granted.

**RECOMMENDATIONS**

57 - FINDINGS AND RECOMMENDATIONS

Based on the foregoing reasons, Home Depot's Motions for Summary Judgment against (dockets # 49 and #54) should be:

DENIED as to the:

> First Claim (both plaintiffs) (Title VII race discrimination);
>
> Second Claim (Strong) (ADEA);
>
> Third Claim (retaliation) with respect to Strong's initial and continued suspension;
>
> Fourth Claim (both plaintiffs) (Section 1981); and
>
> Fifth Claim (wrongful discharge) with respect to Strong's allegations of age discrimination;

GRANTED as to:

> Third Claim (retaliation) as to Adams in full and as to Strong's denial of full-time work;
>
> Fifth Claim (wrongful discharge) as to Adams in full and as to Strong's allegations of race discrimination;
>
> Sixth Claim (Adams) (worker's compensation discrimination); and
>
> Front and back pay claimed by Adams after September 30, 2005, and claimed by Strong after June 30, 2005.

///

///

## **SCHEDULING ORDER**

Objections to the Findings and Recommendations, if any, are due by **September 21, 2007**. If no objections are filed, then the Findings and Recommendations will be referred to a district judge and go under advisement on that date.

If objections are filed, then a response is due within 10 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendations will be referred to a district judge and go under advisement.

DATED this 5th day of September, 2007.

/s/ Janice M. Stewart__
Janice M. Stewart
United States Magistrate Judge

59 - FINDINGS AND RECOMMENDATIONS